[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAR 30, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-13198
Non-Argument Calendar

_____

D. C. Docket No. 05-01155-CV-RWS-1

DOUGLAS COUNTY CHAMBER OF COMMERCE, INC.,

Plaintiff-Appellant,

versus

PHILADELPHIA INDEMNITY INSURANCE COMPANY,
JOHN DOES 1-10,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(March 30, 2007)

Before ANDERSON, BIRCH and MARCUS, Circuit Judges.

PER CURIAM:

The issue in this appeal is whether the complaint and pleadings filed in the

district court by Appellant Douglas County Chamber of Commerce (DCCC) are sufficient to permit DCCC to pursue a claim against Appellee Philadelphia Indemnity Insurance Company (Philadelphia) to recover $145,000 in legal expenses DCCC says it is entitled to under a claims-made insurance policy. DCCC is the insured under the policy issued by Philadelphia. The policy covers DCCC's "loss[es]" and "defense cost[s]" resulting from claims made against DCCC between April 12, 2001 and April 12, 2002. In May 2002, the former president of DCCC brought a Title VII suit against both DCCC and its administrative-services provider, Impact Solutions, Inc. (Impact). Philadelphia paid the legal expenses generated by DCCC. Impact secured its own legal representation and generated its own legal expenses in preparing a defense to the suit. DCCC and Impact prevailed on the former president's Title VII claims at the summary-judgment stage of the proceedings, and the suit was terminated in September 2003.

In light of a subsequent arbitration proceeding between DCCC and Impact, held in May 2004, DCCC agreed to pay Impact $145,000 in legal expenses pursuant to an indemnification provision contained in their service agreement. The $145,000 represented expenses generated by Impact as a consequence of defending itself against the Title VII suit. In March 2005, alleging that the

amount it paid Impact qualifies as a "loss" or a "defense cost" "resulting from" a "claim" "made against the insured during th[e] policy period," DCCC brought this suit against Philadelphia for reimbursement of the $145,000 and for various other violations of state law. The district court rejected DCCC's claims and granted Philadelphia's motion for judgment on the pleadings. DCCC appeals.

## STANDARD OF REVIEW

We review de novo a district court's grant of judgment on the pleadings. Hardy v. Regions Mortgage, Inc., 449 F.3d 1357, 1359 (11th Cir. 2006). We take as true the facts alleged in the complaint and view the evidence in the light most favorable to the non-moving party. Id.

## DISCUSSION

"Under Georgia law, contracts of insurance are interpreted by ordinary rules of contract construction. . . . Where the terms are clear and unambiguous, and capable of only one reasonable interpretation, the court is to look to the contract alone to ascertain the parties' intent." Burkett v. Liberty Mut. Fire. Ins. Co., 278 Ga. App. 681, 682, 629 S.E.2d 558, 559 (2006). Moreover, where the terms of an insurance contract are unambiguous, "the plain meaning of such terms must be given full effect, regardless of whether they might be beneficial to the insurer or detrimental to the insured." Tripp v. Allstate Ins. Co., 262 Ga. App. 93, 96, 584

3

S.E.2d 692, 694 (2003).

In relevant part, the insurance policy at issue provides that: "The Company [Philadelphia] will pay on behalf of the insured [DCCC] any loss and defense cost, resulting from any claim first made against the insured during this policy period." Policy ¶I.A. As a general requirement, if a claim is made against DCCC during the policy period, "[DCCC] shall, as a condition precedent to the obligations of [Philadelphia] under this policy, give written notice as soon as practicable to [Philadelphia] during this policy period . . . but not later than 60 days" thereafter. Policy ¶VII.A. The policy contains a second notice provision under which some claims "will be considered made during this policy period" even if not actually made against the insured until after the policy period has ended. Under this provision, a claim made after the end of the policy period "will be considered made during this policy period" only:

> If during this policy period [April 12, 2001 to April 12, 2002] an insured first becomes aware of circumstances which may subsequently give rise to a claim being made against any insured . . . and . . . before the expiration . . . of this Policy, gives written notice to [Philadelphia] of the circumstances and the reasons for anticipating such a claim, with full particulars.

Policy ¶VII.B. We refer to this second notice provision as the "forward-looking" notice provision.

As relevant to this appeal, two claims were made against DCCC: first, a Title VII suit was brought in May 2002 and, second, an indemnity claim was asserted against DCCC by Impact in August 2003. Although not filed until May 6, 2002—about three weeks after the policy period expired—it is undisputed that the Title VII suit constitutes a "claim" made against DCCC during the policy period, because the written notice DCCC sent to Philadelphia in January 2002 (within the policy period) regarding the pending EEOC investigation was forward-looking notice sufficiently particular to bring the later-filed suit within the policy's scope of coverage. The indemnity claim on the other hand, as we explain below, does not constitute a claim made against DCCC during the policy period and, thus, any losses or defense costs that may have resulted from that claim are not covered by the policy.

A.    The Title VII Suit

Regardless of whether the money that DCCC seeks to recover from Philadelphia in this suit is characterized as a "loss" or a "defense cost" under the policy, it is clear that DCCC's obligation to pay the $145,000 did not "result from" the Title VII suit. Policy ¶I.A. ("The Company will pay . . . any loss and defense cost, resulting from any claim . . . made against the insured during this policy period"). The $145,000 obligation did not result from the suit as a "defense cost"

because DCCC did not incur it as consequence of defending itself against the Title VII suit. Policy ¶II.C.1. (a defense cost is an expense "incurred in the defense of a claim . . . by the insured"). Likewise, the obligation did not result from the suit as a "loss" because the $145,000 was not incurred "as damages" to the plaintiff or "in settlement" of the plaintiff's claim.[1] Policy ¶II.G. ("Loss shall mean money an insured is legally obligated to pay as damages or in settlement"). Instead of resulting from the Title VII suit, the obligation for which DCCC now seeks reimbursement resulted from a second claim made against DCCC—the indemnity claim Impact first asserted in 2003—and the subsequent arbitration proceeding held in May 2004 to adjudicate that claim. DCCC Br. at 21 ("It is DCCC who suffered the loss by the <u>attorneys fees arbitration award</u> holding DCCC legally liable for [Impact's] defense in the [Title VII suit]").

    B.    <u>The Indemnity Claim</u>

According to the terms of the policy, Philadelphia is obligated to pay losses and defense costs on behalf of its insured only where such losses or defense costs "result[] from any <u>claim</u> first <u>made</u> against the insured <u>during this policy period</u>."

---

[1] We construe the policy's definition of "loss" with reference to the Title VII plaintiff, because the policy insures the repayment of a "loss" only where such a loss "result[s] from [a] claim first made against the insured during this policy period," and the plaintiff's Title VII suit is the only "claim" that qualifies as having been first made against DCCC during the policy period.

6

Policy ¶I.A.  As noted above, the policy period ended on April 12, 2002.  Impact first demanded compliance with the service agreement's indemnity provision in a letter sent to DCCC on August 13, 2003.  Thus, even giving DCCC the benefit of the doubt and assuming that Impact's demand letter can be considered a "claim" under the policy, Impact's indemnity claim was "first made against [DCCC]" over a year after the policy period ended.

Under the forward-looking notice provision set forth above relating to claims first made after the expiration of the policy period, in order that Impact's indemnity claim be "considered made during t[he] policy period," it would have been necessary for DCCC to provide Philadelphia written notice, during the policy period, "of the circumstances and the reasons for anticipating such a claim, with full particulars."  A review of the complaint and the pleadings shows that DCCC did not comply with this provision of the policy.

Nowhere does DCCC allege that it notified Philadelphia (whether in writing or otherwise), during the policy period, of the "circumstances which may subsequently give rise to [Impact's indemnity] claim being made" against it.  Rather, the only notice DCCC gave Philadelphia regarding the indemnity claim came in a letter (from Impact to DCCC) dated February 19, 2004—roughly a year and a half after the policy terminated.  Compl. ¶15 ("During the course of the

7

[Title VII] lawsuit against [DCCC and Impact], demand was made to [Philadelphia] for coverage of the defense costs for which [DCCC] was liable to [Impact]").[2]

DCCC had at its disposal all of the information it needed in January 2002 (when it notified Philadelphia of the EEOC investigation) to notify Philadelphia in writing of the fact that, if Impact were subsequently to be named along with DCCC as a defendant in a lawsuit arising out of the discrimination allegations, Impact would likely look to DCCC to reimburse its legal expenses. DCCC knew "the circumstances and the reasons for anticipating such a claim"—namely, that Impact would have looked to DCCC for reimbursement pursuant to the indemnity provision in the service agreement, of which DCCC was fully aware in January 2002. If DCCC believed that such a future claim by Impact would likely result in a "loss" or "defense cost" covered by the policy (as it now alleges), then DCCC should have so notified Philadelphia—that is, DCCC should have complied with the policy's forward-looking notice provision by providing Philadelphia the "full particulars" about "the reasons for anticipating such a claim." But DCCC did not

---

[2] The date on the letter referenced in the complaint refutes DCCC's assertion that this notice, even if provided to Philadelphia (something DCCC has failed to allege), was provided "during the course of the [Title VII] lawsuit." At any rate, the "course of the [Title VII] lawsuit" is not a period of time made relevant by the policy; rather, as the policy directs, we focus on whether notice was given "before the expiration . . . of this Policy."

do so, and the policy terminated on April 12, 2002, well before the indemnity claim was first made. Because DCCC failed to give forward-looking notice in accordance with the requirements of policy, Impact's indemnity claim—made sixteen months after the policy terminated—cannot, under the terms of the policy, "be considered made during th[e] policy period." And because DCCC did not satisfy a condition precedent to coverage—notice of a reasonably foreseeable future claim—the $145,000 at issue in this appeal is not compensable under the policy, and Philadelphia is entitled to judgment as a matter of law.

In an attempt to avoid this conclusion, DCCC argues that its January 9, 2002, notice did in fact satisfy the forward-looking notice provision. In that January 9, 2002, notice, DCCC did include the following sentence:

> Because she [Yarman] is actually a leased employee by Impact Solutions to the Chamber, the matter of her resignation/termination has been given to them for resolution.

We readily conclude that this mere reference to Yarman as a leased employee fails to satisfy the requirement of the forward-looking notice provision, which states that the insured must give written notice of the "circumstances which may subsequently give rise to a claim being made against any insured," and it certainly did not satisfy the requirement that notice be given of the "reasons for anticipating such a claim, with full particulars." In particular, there is no mention, or even hint,

9

of an indemnity obligation on the part of DCCC to assume liability for the actions of Impact.

For the same reasons, we find no merit in DCCC's argument that there is coverage because Impact was its agent and that, as a result of the agency relationship, DCCC was liable for the actions of Impact and for its legal expenses in defending itself. Although we doubt that Impact was actually an agent of DCCC,[3] we can assume <u>arguendo</u> in the posture of this case that an agency relationship did in fact exist, because, even if it did, DCCC's January 2002 notice to Philadelphia clearly lacked any mention of circumstances suggesting an agency relationship, any mention of other circumstances that might have given rise to a claim being made against DCCC, or any mention of the reasons for anticipating such a claim.

Thus, even assuming that DCCC might have been liable for the actions of Impact and for its expenses in defending itself (either pursuant to an indemnity obligation or an agency relationship), and even assuming that Philadelphia's policy would have otherwise provided coverage, the claim was not made within the policy period, and DCCC's notice did not satisfy the forward-looking notice provision with respect to any such claim. Accordingly, the policy does not

---

[3] Lease agreements usually do not create agency relationships.

10

provide coverage for the money sought by DCCC in this case.[4]

## CONCLUSION

For the reasons stated above, the judgment of the district court is affirmed.

AFFIRMED.

---

[4] We find no error in the district court's dismissal of the remaining claims in DCCC's complaint.

11